IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BRAND DESIGN COMPANY, INC., d/b/a HOUSE INDUSTRIES,**<br>　　　　　　　　**Plaintiff,**<br><br>　　　　　　v.<br><br>**RITE AID CORPORATION, SWAY CREATIVE LABS, LLC, GA COMMUNICATIONS, INC., d/b/a PURERED CREATIVE, LLC, and BURNS GROUP, NYC, LLC,**<br>　　　　　　　　**Defendants.** | CIVIL ACTION<br><br><br>NO.  22-1174 |

## MEMORANDUM OPINION

Plaintiff Brand Design Company, Inc., d/b/a House Industries ("House"), is a design studio and typeface foundry that develops and markets proprietary fonts. House alleges that Defendant Rite Aid Corporation,[1] with the assistance of Defendants GA Communications, Inc., d/b/a PureRED Creative, LLC ("PureRED"), Burns Group, NYC, LLC ("Burns Group"), and Sway Creative Labs, LLC ("Sway") (collectively, "Defendants"), used one of these proprietary fonts and its corresponding font software—Neutraface—in the pharmacy chain's rebranding effort, violating licensing agreements that prohibited them from using Neutraface for this purpose. Defendants Burns Group and PureRED now move to exclude the testimony of House's damages expert, Graham D. Rogers, pursuant to *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993). The parties also seek to seal various portions of Rogers' report and their *Daubert* motion briefing. For the reasons that follow, Defendants' *Daubert* motions will be denied, and

---

[1] In October 2023, Rite Aid Corporation filed a petition for Chapter 11 bankruptcy, resulting in an automatic stay of judicial proceedings against it. 11 U.S.C. § 362(a). Accordingly, while this opinion will occasionally refer to House' claims against Rite Aid, it only concerns the claims against the other three defendants.

1

the parties' motions to seal will be granted in part and denied in part.

## I. FACTUAL BACKGROUND

As noted, this is a breach of contract, unfair competition, and unjust enrichment lawsuit stemming from Defendants' utilization of Neutraface in Rite Aid's recent rebranding effort. House alleges that Defendants obtained access to Neutraface by purchasing a "standard form 'desktop' license from House. . . . Per the Complaint, each desktop license held by Defendants provides that certain 'uses of the Licensed Software and Fonts and glyphs generated thereby are expressly NOT PERMITTED,' including use in a 'logo' and use in '[a]ny product for sale, product packaging, digital/social media/web advertising, print/POS advertising, and/or tv advertising.'" *Brand Design Co. v. Rite Aid Corp.*, 623 F.Supp.3d 526, 532 (E.D. Pa. 2022).

House has hired Graham D. Rogers, an economic consultant, to identify damages resulting from Defendants' alleged actions. His report[2] calculated damages in two general categories: (1) actual damages sustained by House, and (2) disgorgement of each Defendants' profits.

As to that first category, Rogers explained in his report that the "commonly accepted remedy of actual damages" in a licensing dispute is "lost profits in the form of lost licensing profits"—in other words, the value of the hypothetical license that defendants were obligated to, but did not, obtain. To determine the value of this hypothetical license, Rogers utilized the methodology set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970). In that case, which stemmed from a patent infringement, the court identified 15 evidentiary factors it deemed generally relevant "to the determination of a reasonable royalty

---

[2] As Defendants did not depose Rogers, this report is the only indication of the opinions Rogers would offer if called to testify at trial.

for a patent license." *Id.* at 1120.  These factors included "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit"; "[t]he commercial relationship between the licensor and licensee"; "[t]he duration of the patent and the term of the license"; and "[t]he extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." *Id.*  As Rogers' report explained, this methodology is "frequently used in non-patent license disputes," as it provides helpful "guidance to experts and the parties when determining a hypothetical license value."  After evaluating the 15 *Georgia-Pacific* factors, Rogers concluded that "House [would be] in a strong bargaining position during the hypothetical negotiation" with Defendants.  And, extrapolating from prior licensing agreements negotiated by House considering those factors, he ultimately concluded that the total lost profit from Defendants' hypothetical license was approximately $7.5 million.

In the alternative, Rogers calculated the lost profits if Defendants had sought to purchase (rather than license) House's font—something his report acknowledged "is not common practice in the industry."  To do so, he utilized the "income approach," which values an intangible asset based on the present value of the future income streams expected from the asset under consideration.  Applying this method, he opined that following hypothetical negotiations, Defendants would have agreed to purchase, and House would have agreed to sell, Neutraface for approximately $7.7 million.

With regards to disgorgement of profits, Rogers' report explained that his goal was to identify the percentage of Defendants' revenue that could be reasonably attributed to their improper use of Neutraface.  As to the advertising agencies, he opined that their "profits are directly tied to either their alleged breach of the licensing agreements or alleged unjust enrichment."  After totaling the invoices related to the Rite Aid rebranding, and offsetting this

3

sum by his estimation of deductible costs, Rogers concluded that the profit subject to disgorgement from PureRED, Burns Group, and Sway was approximately $6 million, $775,000, and $41,000, respectively.

## II. MOTIONS TO EXCLUDE EXPERT TESTIMONY

### A. Legal Standard

*Daubert* and its progeny established a "gatekeeping" role for trial courts to ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. As codified in Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In short, *Daubert* "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003)).

### B. Discussion[3]

#### i. Fit

Both Burns Group and PureRED challenge the fit of Rogers' expert opinions, arguing (albeit for somewhat different reasons) that his report is inadmissible on this basis. In the context of a *Daubert* motion, the question of "fit" boils down to whether an expert's testimony will assist the trier of fact. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) ("*Paoli II*"). "[A]dmissibility depends in part on 'the proffered connection between the scientific

---

[3] No party challenges Rogers' qualification to opine on the damages sustained by House.

4

research or test result to be presented and particular disputed factual issues in the case.'" *Id.* (quoting *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985)). "This standard is not intended to be a high one." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000). As the Third Circuit has emphasized, the proponent of expert testimony need only demonstrate "by a preponderance of proof" that there is "a valid scientific connection" between the expert's opinions and a relevant inquiry. *In re TMI*, 193 F.3d 613, 663 (3d Cir. 1999).

For its part, PureRED first faults Rogers for computing House's lost licensing profits by evaluating a hypothetical negotiation between House and Rite Aid, rather than a hypothetical negotiation between House and the other defendants. This, it argues, makes the opinions in his report irrelevant as to any damages caused by PureRED's alleged breach of contract. But Rogers addressed that point directly in his report, explaining that baked into his analysis was an assumption that "Rite Aid would likely seek to sublicense its rights to Neutraface to at least PureRED, Burns Group, and Sway." Put another way, his damages' estimate reflected the lost value of a license that would have been utilized by all four defendants to this action, not just the damages resulting from Rite Aid's own alleged breach of contract. PureRED plainly disagrees with Rogers' views about the likelihood of a sublicense, as well as his conclusion that an analysis of a hypothetical negotiation between House and Rite Aid accurately incorporates the damages that are attributable to the other Defendants. But those disagreements just go to the correctness of Rogers' opinions, a question "for the trier of fact when the expert is subjected to cross-examination." *Oddi*, 234 F.3d at 146 (quoting *Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)); *cf. Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Second and relatedly, PureRED argues that Rogers' testimony would be unhelpful to a jury because he failed to connect his damages estimate to the specific actions of each defendant. By way of background, Pennsylvania requires plaintiffs claiming breach of contract to "show a causal connection between the breach and the loss" to recover damages. *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 231 (3d Cir. 1995) (quoting *Logan v. Mirror Printing Co.*, 600 A.2d 225, 226 (Pa. Super. 1991)). Rogers' damages assessment, PureRED argues, shed no light on this essential question, since he "did not provide any evidence that the alleged damages were proximately caused by PureRED's alleged wrongful act." This argument fails for multiple reasons. First, the burden of establishing causation lies with House as part of its case-in-chief—not with the expert it hired to opine on damages. In other words, even if Rogers' report was entirely silent with regards to causation, that would still not be a basis to exclude his testimony, as "an expert need not testify as to causation in order to testify as to damages." *Safeco Ins. Co. of Am. v. S&T Bank*, 2010 WL 786257, at *6 (W.D. Pa. Mar. 3, 2010); *see also Rhodes Indus., Inc. v. Shoreline Foundation, Inc.*, 2021 WL 2778562, at *33 (E.D. Pa. July 2, 2021) ("Defendants seem to have blurred the line between [the expert's] assumptions as to causation and his opinions as to damages.").

And in any event, Rogers' report was not silent as to causation. As just explained, his report made clear that his conclusions were premised on an assumption that Rite Aid would have obtained a single Neutraface license that could have also been utilized by its advertising agencies, making all four defendants jointly liable for the lost value of that license. Thus, as his report put it, "Lost Licensing Profits would encompass all Defendants." To be clear, an assumption about causation is not an objective fact, and Rogers may not present it as such in his trial testimony. And, as before, PureRED is free to explore the credibility of opinions resulting

6

from this assumption during its cross-examination. But even if Rogers' report relied on an assumption about causation as a starting point is not a basis to exclude his conclusions. As a sister judge on this Court aptly explained:

> Ideally, a damages expert could present a calculation of damages for every foreseeable interpretation of the record and factual finding. However, . . . it is more practical for each expert to base his calculations on a particular factual scenario, presumably as posited by or on behalf of the party offering the expert. . . . To the extent these experts present their factual findings as hypothetical (i.e., if propositions A, B and C are found to be true, then the damages amount to X), then testimony regarding their assumptions is admissible.

*Brill v. Marandola*, 540 F.Supp.2d 563, 570 (E.D. Pa. 2008) (Pratter, J.).

Third, Burns Group challenges Rogers' opinions concerning House's lost opportunity to sell Neutraface. It expresses no qualms about the methodology itself—*i.e.*, Rogers' "income approach" for valuing an intangible asset—but rather homes in on the caveat that selling fonts "is not a common practice in the industry and that in the normal course of business House would not sell Neutraface." Thus, Burns Group argues, because Rogers' opinions regarding lost opportunity to sell damages are premised on an admittedly improbable scenario, they have no bearing on this dispute and should be excluded. But again, it is axiomatic that "a qualified expert may answer hypothetical questions." *Teen-Ed, Inc. v. Kimball Intern., Inc.*, 620 F.2d 399, 404 (3d Cir. 1980); *accord* Fed. R. Evid. 703 & accompanying Advisory Committee notes. And that is exactly what Rogers' report did. The credibility of this scenario as a realistic measure of damages in this case is a question for the trier of fact.

Finally, both PureRED and Burns Group seek to exclude Rogers' opinions regarding profits subject to disgorgement, arguing that his report reflected significant gaps in his accounting of the income and expenses associated with the Rite Aid rebranding efforts. But during discovery, House's interrogatories specifically requested that each defendant disclose "all

payments made by Rite Aid to [each agency] in connection with the New Rite Aid Logo or Rite Aid's Rebranding," and as Rogers' report explained, his calculations were based on the records Defendants provided in their responses.[4] Defendants are free to explore any discrepancies between Rogers' opinions and these records as they seek to undermine his credibility at trial. But, particularly since they were specifically asked to produce a complete accounting of their profits, they are poorly positioned to complain that Rogers' report failed to reflect documents that were not made a part of the record.

### ii. Reliability

In addition to its arguments regarding the fit of Roger's testimony, Burns Group also challenges its reliability. The question of "reliability" goes to the reliability of an expert's methods. Courts must assess whether a particular methodology is scientifically valid, considering factors like whether it "has been subjected to peer review and publication, the frequency by which the methodology leads to erroneous results, the existence and maintenance of standards controlling the technique's operation, and whether the methodology has been generally accepted in the scientific community." *Paoli II*, at 742. As with the question of fit, the proponent of expert testimony bears the ultimate burden of establishing its reliability by a preponderance of evidence. *Oddi*, 234 F.3d at 144 (citing *Daubert*, 509 U.S. at 593 n.10).

With regards to House's alleged lost licensing profits, Burns Group first argues that Rogers erred by utilizing the *Georgia-Pacific* framework, arguing that that case involved a claim for patent infringement, not breach of contract. This is a distinction without a difference.

---

[4] PureRED suggests that it "had no obligation to produce any information relating to its profits because House never claimed or disclosed a disgorgement theory until after the close of fact discovery." That is flat wrong. The federal rules permit discovery on "any nonprivileged matter that is relevant to any party's claim or defense," Fed. R. Civ. P. 26(b)(1), and they do not permit unilateral non-compliance by the opposing party. Here, payments made by Rite Aid to the other Defendants in connection with its rebranding effort are clearly relevant to House's claims.

Regardless of the change in context, the measure of damages in *Georgia-Pacific*—*i.e.*, the value of a hypothetical license that "the parties would have agreed upon, if both were reasonably trying to reach an agreement," 318 F.Supp. at 1121—is precisely the same as the "lost licensing profits" Rogers sought to estimate. Burns Group offers no explanation for why that case's methodology for determining the value of such a hypothetical license was an inappropriate tool for the question Rogers was attempting to answer, nor does it point to any authority for its claim that the *Georgia-Pacific* factors are unreliable considerations outside patent royalty disputes.

Next, Burns Group takes aim at how Rogers evaluated and weighted several of the *Georgia-Pacific* factors, arguing that his analysis relied on "nonsensical" assumptions, improper analogies, and ultimately produced a "grossly inflated" damages estimate. But its briefing spends considerable time setting fire to straw men, casting doubt on opinions that Rogers did not actually render. For example, Burns Group argues that when evaluating the thirteenth *Georgia-Pacific* factor ("The portion of the realizable profit that should be credited to the [font] as distinguished from [non-font] elements, the manufacturing process, business risks, or significant features or improvements added by the infringer," 318 F.Supp. at 1120), Rogers "made *no attempt* to isolate the profit associated with the Neutraface font" (emphasis added). This is not accurate. Rogers' report included an estimation of profits associated with Neutraface (as part of his computation of profits subject to disgorgement). And indeed, elsewhere in its brief, Burns Group specifically takes issue with that estimate, calling Rogers' methods "speculative and unreliable."

As for the opinions that Rogers did offer, Burns Group has not demonstrated that Rogers' conclusions regarding the *Georgia-Pacific* factors methods were erroneous or otherwise unreliable. At most, it has demonstrated that reasonable experts might disagree regarding some

9

of his assumptions. For example, when evaluating the first *Georgia-Pacific* factor ("The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty," *id.*), Rogers identified a license negotiated between House and Baskin-Robbins as "a starting point for assessing a likely licensing fee between House and Rite Aid." An expert hired by Burns Group, in contrast, opined that the "desktop licenses" actually obtained by several defendants in this case are a more reasonable starting assumption. This kind of battle-of-the-experts is a quintessential example of a dispute that cannot be resolved by a *Daubert* motion. *See TMI*, 193 F.3d at 665 ("[I]f the methodology and reasoning are sufficiently reliable to allow the fact finder to consider the expert's opinion, it is that trier of fact that must assess the expert's conclusions."). Similarly, when evaluating the eleventh *Georgia-Pacific* factor ("The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use," 318 F.Supp. at 1120), Rogers opined that Rite Aid's rebranding efforts were responsible for an approximately six percent growth in revenue. Burns Group retorts that "there is no evidence that the Neutraface font contributed materially to Rite Aid's revenues," but that is a challenge to the correctness of Rogers' opinions and is thus properly directed to the trier of fact.

     The same is true of Rogers' calculation of Defendants' profits subject to disgorgement. Burns Group describes his methods as "speculative and unreliable," arguing that the company "has no profits" and that Rogers "overstated the profitability of Burns." But this is a dispute of fact, not an issue of reliability under *Daubert*, and as such "must be resolved by a fact-finder at trial." *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation*, 2020 WL 6887885, at *37 (E.D. Pa. Nov. 24, 2020); *accord Walker v. Gordon*, 46 F. App'x 691, 695 (3d Cir. 2002) ("An expert is . . . permitted to base his opinion on a particular version of disputed

facts and the weight to be accorded to that opinion is for the jury."). And while Burns Group further claims that Rogers "failed to consider the impact of the relationship between Burns and Rite Aid on Burns' profits," it offers no explanation for why this supposed omission affected the reliability of Rogers' expert opinions.

### iii. Risk of Prejudice

Finally, PureRED briefly argues that even if Rogers' testimony is reliable and relevant under Rule 702 and *Daubert*, it must nonetheless be excluded because "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. But the only explanation it offers for why this evidence would be unfairly prejudicial is that "Rogers' opinions on actual damages are solely based on considerations relating to Rite Aid, not PureRED." Even assuming this contention were correct, it would fall well short of the threshold for excluding evidence under Rule 403. As the Third Circuit has explained, that rule is intended to keep out the kind of inflammatory evidence "which clouds impartial scrutiny and reasoned evaluation of the facts, which inhibits neutral application of principles of law to the facts as found." *Goodman v. Pa. Turnpike Comm'n*, 293 F.3d 655, 670 (3d Cir. 2002) (cleaned up). "[P]rejudice does not simply mean damage to the opponent's cause." *Id.* (quoting 1 McCormick on Evidence § 185 (5th ed. 1999)).

### III. MOTIONS TO SEAL

The parties have also moved to seal portions of their *Daubert* briefing and accompanying exhibits. In both civil and criminal contexts, "the common law presumes that the public has a right of access to judicial materials." *In re Avandia Mktg., Sales, Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019). Once this presumption attaches,[5] it may only be rebutted by a

---

[5] The public's right of access extends to "judicial records," which the Third Circuit defined as document which have

showing that the parties' "interest in secrecy outweighs the presumption." *Id.* Specifically, "[t]he movant must show "that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *Id.*

Here, House seeks leave to redact the portions of the parties' *Daubert* briefing and its attachments (including Rogers' report) containing three categories of information: (1) information regarding House's proprietary pricing structure; (2) details of confidential contract terms and negotiations with non-parties; and, (3) details regarding House's historical revenues. As its motion explains, public disclosure of this information would cause House to suffer a competitive disadvantage in the marketplace by undermining its negotiating position in future licensing ventures. In addition, and for much the same reason, Burns Group and PureRED seek redactions relating to non-public financial data of each Defendant, such as their historic revenues.

It is well established in this circuit that the disclosure of sensitive financial information is the sort of "clearly defined and serious injury" warranting a departure from the presumption of access to judicial records. *See, e.g.*, *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 592 F.Supp.2d 825, 828 (E.D. Pa. 2009); *Goldenberg v. Indel, Inc.*, 2012 WL 15909, at *4 (D.N.J. Jan. 3, 2012); *United States v. Dentsply Int'l, Inc.*, 187 F.R.D. 152, 159 (D. Del.1999). *Cf. Del. Coal. for Open Gov't, Inc. v. Strine*, 733 F.3d 510, 519 (3d Cir. 2013) (describing an arbitration rule permitting "the confidential filing of documents, including trade secrets; sensitive proprietary information; and sensitive financial, business, or personnel information" as

---

"been filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings." *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001). Said differently, "there is a presumptive right of public access to pretrial motions of a nondiscovery nature, whether preliminary or dispositive, and the material filed in connection therewith." *Id.* at 192-93 (quoting *Leucadia, Inc. v. Applied Extrusion Tech., Inc.*, 998 F.2d 157, 164 (3d Cir. 1993)). This definition plainly encompasses Defendants' *Daubert* motions and the attachments thereto.

"compatible" with the public right of access). The Court, having reviewed the documents in question and the parties' proposed redactions, agrees that release of this information has the strong potential to result in financial injury, warranting its sealing.[6]

In addition to its proposed redactions to the parties' briefing, PureRED also moves to seal Rogers' report in its entirety, arguing that it contains "specific confidential data." But when seeking to overcome the public right of access, "specificity is essential," *Cendent*, 260 F.3d at 194, and PureRED offers no explanation for why sealing Rogers' report in toto (as opposed to redacting portions of it) is necessary to prevent a clearly defined and serious injury. *See In re Lincoln Nat. COI Litig.*, 620 F.Supp.3d 230, 268 n.1 (E.D. Pa. 2022) ("[P]arties should propose the most limited redactions consistent with preventing the injuries they identify."). As such, this portion of its motion will be denied.

### IV. CONCLUSION

For the forgoing reasons, the Defendants' motions to exclude the testimony of Graham D. Rogers will be denied, and the parties' respective motions to seal will be granted in part and denied in part.

An appropriate order follows.

**BY THE COURT:**

*/s/ Wendy Beetlestone*
_____
**WENDY BEETLESTONE, J.**

---

[6] That said, "the public and the press have a First Amendment right of access to civil trials," and this right requires "a much higher showing than the common law right [of] access before a judicial proceeding can be sealed." *Avandia*, 924 F.3d at 673. Thus, if Rogers testifies, he will do so in open court.