**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BRAND DESIGN COMPANY, INC., d/b/a HOUSE INDUSTRIES,**<br>        **Plaintiff,**<br><br>        **v.**<br><br>**RITE AID CORPORATION, SWAY CREATIVE LABS, LLC, GA COMMUNICATIONS, INC., d/b/a PURERED CREATIVE, LLC, and BURNS GROUP, NYC, LLC,**<br>        **Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO.  22-1174** |

## <u>MEMORANDUM OPINION</u>

Plaintiff Brand Design Company, Inc., d/b/a House Industries ("House"), is company that develops and markets proprietary font software, logos, and related products.  One of its most popular typefaces is Neutraface, and House generates considerable revenue by licensing the software necessary to generate this font and its associated glyphs.  Defendant Rite Aid Corporation, with the assistance of Defendants Sway Creative Labs, LLC ("Sway"), Burns Group, NYC, LLC ("Burns Group"), and GA Communications, Inc., d/b/a PureRED Creative, LLC ("PureRED"), (collectively, "Defendants"), recently unveiled a multi-million dollar corporate rebrand that makes heavy use of Neutraface.  This, House alleges, notwithstanding the fact that the licenses obtained by Rite Aid and its advertising agencies did not permit them to use Neutraface for this purpose.

Presently pending are cross-motions for summary judgment from all parties save Rite Aid[1] and Burns Group, pursuant to Federal Rule of Civil Procedure 56.  Additionally, the parties

---

[1] Pursuant to 11 U.S.C. § 362(a), proceedings in this matter are currently stayed as to Rite Aid in light of the

move to seal various portions of the summary judgment record. For the reasons that follow, these motions will be granted in part and denied in part.

## I.   FACTUAL BACKGROUND

Unless otherwise noted, the following facts are undisputed. House is a design studio and typeface foundry that develops and licenses a suite of proprietary products. One of these proprietary products is Neutraface, a sans-serif typeface consisting of upper- and lower-case letters, numbers, and an alternative font in multiple weights and a unique tilting. After developing the Neutraface font and glyphs, House wrote these designs into font software that could faithfully reproduce their designs and interactions with one another (spacing, kerning, *etc.*). The licensing agreement for the Neutraface font software defined these terms as follows:

  – **Font**: a set of character outlines that defines a particular typeface (e.g. Times New Roman) in one or more stylizations (e.g., Script, Interlock)
  – **Font software**: machine readable instructions for causing a rasterizing device to render a font
  – **Glyph**: a graphic symbol that provides the appearance or form for a character

For clarity, this opinion will use the term "Neutraface" to refer collectively to the Neutraface font, glyphs, and font software, with further specificity added as needed.

House did not, nor could it, hold a copyright in the Neutraface font or glyphs. *See* 37 C.F.R. § 202.1(e) (listing "[t]ypeface as typeface" as an "example[] of works not subject to copyright"). It did, however, control access to the font software, which was the only practical way to generate the Neutraface font and glyphs. House's business model therefore consisted of licensing this font software to users; the permitted uses of that font software and the font and glyphs generated thereby were governed by a contract: a licensing agreement entered into by

_____

company's recent bankruptcy filing.

House and its licensees.

Defendants each purchased a "desktop" version of the Neutraface font software, and in doing so agreed to the terms of the accompanying licensing agreement.  Sway and Burns Group purchased their copies in 2019, after Rite Aid selected Neutraface for use in rebranding, and the summary judgment record contains copies of their licensing agreements.  PureRED, conversely, had a copy of the Neutraface software that it had purchased in 2015; in early 2020, though, it requested an additional copy of the font software, which House provided pursuant to PureRED's 2015 purchase.  As with all of House's font software, this copy came packaged with a "clickwrap" licensing agreement.

Though there are minor differences between the three licensing agreements in the record, most of their key provisions were identical.  First, Paragraph 2 of the licensing agreements provided that "[l]icensed uses of the Licensed Software [*i.e.*, "House Industries Font software"] and Fonts and glyphs generated thereby in accordance with this agreement include: (a) Installation on the number of Devices specified on the invoice associated with this License; (b) Embedding in documents for the purpose of: (i) Proofing or distributing to fewer than 100 people; (ii) Sending files for print production; (c) Using in conventional office correspondence."

Second, Paragraph 8 of the licensing agreement enumerated a number of uses of the font, font software, and glyphs that "are expressly NOT PERMITTED under this agreement."  For all three Defendants, this list includes "In a logo."  The term "logo" is defined to mean "a unique set of stylized letters, optionally integrated with graphic elements, adopted as a proprietary identifier, such as a trademark."  Additionally, Paragraph 8 of the agreement for Sway (though not Burns Group or PureRED) prohibited their use in "Any product for sale, product packaging, digital/social media/web advertising, print/POS advertising, and/or tv advertising."

Third, Paragraph 10 of the licensing agreements provided that "Licensee agrees to treat the Licensed Software as confidential information and exercise reasonable care to avoid unauthorized distribution of the Licensed Software."

Finally, Paragraph 14 of the licensing agreement provided that "[a]ll rights not expressly identified and granted as part of this License are expressly reserved by House Industries."

In late 2020, Rite Aid announced its rebranding effort, unveiling a new logo that utilized Neutraface, as depicted below:





In addition to this logo, the rebranding also utilized Neutraface in other applications, *e.g.*, other Rite Aid logos (such as the logo for Rite Aid Rewards), in-store signage, digital/print/television advertising, product packaging, prescription bottles, and other branded products.

## II.   LEGAL STANDARDS

### A.  Summary Judgment Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light

of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). "Inferences to be drawn from the underlying facts contained in the evidential sources must be viewed in the light most favorable to the party opposing the motion." *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987).

When, as here, the parties have filed cross-motions for summary judgment, the summary judgment standard remains the same. *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F.Supp.2d 425, 430 (M.D. Pa. 2006) (citing *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998)).

### B. Choice of Law

The Amended Complaint describes House's claims as arising "under Pennsylvania common law," and House relies on that jurisdiction's substantive law in its motions for summary judgment. Two defendants—Sway and Burns Group—acquiesce to this choice without comment, and so with regards to House's claims against them, the Court will as well. *See Buck v. Endo Phara., Inc.*, 2019 WL 1900475, at *3 (E.D. Pa. Apr. 29, 2019) ("When the parties agree a state's law applies, we apply the agreed-to law."); *see also Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 180 (3d Cir. 1995) (en banc) ("[C]hoice of law issues may be waived."). PureRED, however, maintains that this dispute should be resolved by applying the law of Georgia (the state of its incorporation), arguing that "Pennsylvania has no interest in applying its laws to the parties' contract."[2]

---

[2] House argues that PureRED waived this choice of law argument by failing to raise it in its responsive pleading.

"However, before a choice of law question arises, there must actually be a conflict between the potentially applicable bodies of law." *On Air Ent. Corp. v. Nat. Indem. Co.*, 210 F.3d 146, 149 (3d Cir. 2000).  If there is no actual conflict, "the court should avoid the choice of law question." *Id.*  Here, although PureRED's briefing cites extensively to non-Pennsylvania caselaw, the only specific conflict it identifies is one of remedies—namely, whether state law permits a plaintiff to seek disgorgement of profits when a defendant's breach of contract was "opportunistic."  That point will be addressed in Part III.C.  But absent an argument that some other conflict exists, the remainder of this opinion will be evaluated under Pennsylvania law.

## III.   BREACH OF CONTRACT CLAIMS

The first count in House's Amended Complaint is for breach of contract, which it presses against all Defendants.  To successfully maintain this cause of action, "the plaintiff must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Hart v. Arnold*, 884 A.2d 316, 332 (Pa. Super. 2005).  House argues that it is entitled to judgment as a matter of law on liability, and that a trial is only needed to determine the damages stemming from Defendants' breach.  Defendants Sway and PureRED, conversely, argue that the evidence shows the opposite, and that they are entitled to judgment as a matter of law on House's breach of contract claim.  Although it did not file a motion for summary judgment, Burns contends in its response to House's motion for summary judgment that contractual ambiguities mean that this case must be submitted to a jury.

For the reasons that follow, the summary judgment record establishes the existence of a

---

But its principal authority for this proposition, *Nat. Grange Mut. Ins. Co. v. Goldstein, Heslop, Steel, Clapper, Oswalt & Stoehr*, 142 F. App'x 117 (3d Cir. 2005), was discussing waiver in the context of state court proceedings—a critical distinction, as litigants in that Pennsylvania courts are required to affirmatively plead any choice of law defenses. *Id.* at 124 (citing 42 Pa. C.S. § 5327(a) and Pa. R. Civ. P. 1030(a)).  Not only does a that rule not apply in federal court, PureRED's motion to dismiss explicitly flagged a potential choice of law dispute. That was sufficient to avoid waiver.

valid contract between House and each of the Defendants.  But, as to some of House's theories of breach, the record shows genuine disputes of material fact on the remaining elements that must be resolved by a jury.  And with regards to other theories, no reasonable factfinder could find in House's favor.

### A.  Element 1: Existence of a Contract

There is no dispute that Sway nor Burns Group had a contract with House; both agree that the licensing agreement they agreed to when downloading the Neutraface font software was valid and binding.

PureRED, however, argues that things are not so straight-forward.  The company had initially purchased a desktop license for Neutraface in 2015, well before Rite Aid's rebranding got underway.  PureRED maintains that much of its work for the pharmacy chain was performed pursuant to that 2015 license.  House did not, however, produce the licensing agreement associated with that purchase during discovery.  As a result, PureRED argues, House has not met its burden of establishing "[the contract's] essential terms." *Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. 2006).

But PureRED's insistence that a missing, 2015 contract governs this dispute is belied by the testimony of its corporate representative, Jonna Unger.  Specifically, during her 30(b)(6) deposition, Unger was shown a copy of a licensing agreement for the Neutraface font software,[3] and she was asked if that agreement "governs the licenses between House and Rite Aid, as well as House and PureRED."  She responded that it did.  "[T]he testimony of the Rule 30(b)(6) designee is deemed to be the testimony of the corporation itself," *State Farm Mut. Auto. Ins. Co.*

---

[3] This document, which is included in the summary judgment record, is undated.  At oral argument, House represented it was the licensing agreement agreed to by PureRED in early 2020, when the company obtained an additional copy of the Neutraface font software.

*v. New Horizont, Inc.*, 250 F.R.D. 203, 212 (E.D. Pa. 2008), and so this testimony alone is

sufficient to resolve any doubt regarding the existence of a contract between PureRED and

House, that it was the document handed to her, and that the terms of that document governed the

relationship between House and PureRED.

Nevertheless, once House flagged Unger's testimony in its motion for summary

judgment, PureRED attempted to walk it back, producing a sworn declaration in which Unger

averred that she is actually "uncertain which version of this license was the one PureRED would

have agreed to on May 20, 2020." But this self-serving document, drafted more than 8 months

after Unger sat for her deposition, is not enough to make out a genuine dispute of material fact.

As the Third Circuit has explained, "a party may not create a material issue of fact to defeat

summary judgment by filing an affidavit disputing his or her own sworn testimony without

demonstrating a plausible explanation for the conflict." *Baer v. Chase*, 392 F.3d 609, 624 (3d

Cir. 2004). That rule—known as the sham affidavit doctrine—applies here. Unger's only

explanation for the flat inconsistency between her deposition testimony and sworn statement was

that she "[is] not a lawyer," and that she was confused as to exactly what document she was

being shown. This is not a plausible explanation. As PureRED's corporate representative,

Unger had advanced notice of "the matters for examination," Fed. R. Civ. P. 30(b)(6), and could

have conferred with her attorneys regarding the same.[4]  "Rule 30(b)(6) obligates the corporation

'to prepare its designee to be able to give binding answers' on its behalf." *In re Linerboard*

---

[4] Though the summary judgment record does not contain a copy of the 30(b)(6) deposition notice, it presumably included this topic. The transcript shows that when Unger was asked about the licensing agreement, PureRED's lawyers objected (incorrectly) that the inquiry called for a legal conclusion, and further that it was inappropriately phrased as a compound question. No objection was noted, however, on the basis that the question exceeded the scope of the deposition notice. *See* Wright & Miller, 8A Fed. Prac. & Proc. § 2113 (3d ed., Apr. 2023 update) ("A party waives any objection, whether to the form of questions or answers or to other errors that might be obviated, removed, or cured if promptly presented, by failing to note the objection at the taking of the deposition.").

*Antitrust Litig.*, 237 F.R.D. 373, 382 (E.D. Pa. 2006) (quoting *Ierardi v. Lorillard, Inc.*, 1991 WL 158911, at *3 (E.D. Pa. Aug. 13, 1991)).  If Unger's affidavit is to be believed, PureRED did not do so here.

### B.  Element 2: Breach of the Contract

Because there was a valid contract between House and each of the Defendants, the question becomes whether the evidence adduced during discovery shows a breach of the duties those contracts imposed.  House argues that no reasonable factfinder could conclude otherwise, and that while the particulars vary somewhat between each Defendant, the summary judgment record unambiguously shows breaches of three provisions of the licensing agreement: Paragraph 8(k) (prohibiting Neutraface's use "[i]n a logo"); Paragraph 10 (requiring licensee to "treat the Licensed software as confidential information"); and Paragraph 2 (identifying the "[l]icensed uses of the Licensed Software and fonts and glyphs generated thereby").  These theories of breach will be addressed seriatim below.

### i.  *Breach of Paragraph 8(k)*

House's first theory of breach relates to Paragraph 8(k) of the licensing agreement.  Recall that Paragraph 8 identified a number of prohibited uses of the House's software, fonts, and glyphs generated thereby.  And this list included using Neutraface "[i]n a logo for a product, company, or other entity,"[5] defining the term "logo" to mean "a unique set of stylized letters, optionally integrated with graphic elements, adopted as a proprietary identifier, such as a trademark."  According to House, this is exactly what happened.  The summary judgment record shows that on various occasions during their work for Rite Aid, each of the Defendants utilized

---

[5] Sway's licensing agreement omits the phrase "for a product, company, or other entity," but no party ascribes any significance to this difference.

the Neutraface font software to create or edit some version of the Rite Aid logo: the "shield" logo (Sway); the "tagline" logo (Burns Group); and the "work mark," "Women's Leadership Network," and "Rite Aid Photo" logos (PureRED).   As a result, House argues, each Defendant breached Paragraph 8(k) of the licensing agreement.

This evidence is materially uncontroverted, and it is consistent with the allegations in the Amended Complaint.   Nonetheless, Defendants argue that it does not actually show a breach of contract.   As noted, the licensing agreements define the term "logo" to mean "a unique set of stylized letters . . . ***adopted as a proprietary identifier***, such as a trademark" (emphasis added).   The only reasonable interpretation of this provision, Defendants argue, is that it refers to "a unique set of stylized letters" that the licensee of the font software (*e.g.*, Sway, Burns Group, or PureRED) has adopted as an identifier—not something the licensee prepares for use by a third-party client (*e.g.*, Rite Aid).   In other words, because Sway, Burns Group, and PureRED did not use Neutraface to develop a trademark that they adopted for themselves, they did not use the font software "[i]n a logo" as the term is defined by the contract.   House counters with the inverse of this position.   By their reading, the licensing agreement defines "logo" as a set of stylized letters adopted as a proprietary identifier by anyone—be they the licensee of the font software or the licensee's third-party client.   Any other construction of the contract, they maintain, would inappropriately add in a limitation to the definition of the term "logo" that the contract's plain text does not include.

These arguments are not new.   The parties previously aired them, without any meaningful difference, in their briefing on Defendants' motions to dismiss.   At that time, the Court determined that the text of the licensing agreements did not permit resolution in favor of either position.   Although the Neutraface licensing agreements require that someone have adopted the

10

Defendants' work product as a proprietary identifier in order for it to be deemed a "logo," those agreements "do[] not specify who—be it the licensee, the licensee's client, or some other third party—may" do so. *Brand Design v. Rite Aid*, 623 F.Supp.3d 526, 536 (E.D. Pa. 2022). Because both parties offered reasonable interpretations, and the text of the contract did not establish which interpretation was correct, the contract was facially ambiguous and therefore "present[ed] a question for the jury." *Id.*

But that holding is not the end of things, now that discovery has been had. Pennsylvania permits courts to "look outside the 'four corners' of a contract if the contract's terms are unclear" by considering "extrinsic evidence, *i.e.*, parol evidence, to resolve the ambiguity." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001) (citing *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. 1993)). Now that discovery is complete, both Plaintiff and Defendants point to examples of such extrinsic evidence, arguing that when considered alongside the text of the licensing agreement, it leaves no doubt that their respective interpretation is the only reasonable one.

For its part, House highlights evidence supposedly showing that, regardless of any imprecision in the licensing agreement's text, Defendants were subjectively aware that they were violating its terms when utilizing Neutraface to develop Rite Aid's logo. For example, it notes that Emily Stern, Burns Group's corporate representative, testified at her 30(b)(6) deposition that at least some of the company's employees had concerns about whether their license permitted their uses of Neutraface. In a similar vein, it points to emails between PureRED's Jonna Unger and Rite Aid employees raising doubts about whether "the proper license [has] been purchased." Because the goal of contract interpretation is ultimately to discern the intent of the parties, House argues, evidence that Defendants may have agreed with House's interpretation of the contract

provides strong reason to conclude that it is correct.

Defendants, meanwhile, argue that any contract must be interpreted in light of the nature and custom of the industry, and they point to deposition testimony indicating that this standard industry practice was to permit advertising agencies to utilize desktop license when undertaking preliminary design work on behalf of a client.  House was no exception to this general practice, Defendants argue, noting emails in which its licensing director explained to PureRED that "[o]ur desktop license is for design," while only "commercial deployment of the fonts" required "extended licensing."  This view was echoed on House's website, which explained additional licensing was required for "commercial deployment of collateral."

But "when parol evidence is used to resolve an ambiguity in a contract, the intention of the parties is a question of fact." *Hankin v. Goodman*, 246 A.2d 658, 660 (Pa. 1968).  Thus, like any question of fact, summary judgment is only proper when the evidence reveals no genuine dispute for resolution by the fact finder.  That is not the case here.  Even accepting the parties' arguments that this parol evidence sheds light on the licensing agreement's meaning, the evidence points in opposite directions, only further highlighting the ambiguous nature of the contractual language.  As such, the question of whether Defendants breached Paragraph 8 of the licensing agreement must be submitted the jury.

### ii.    *Breach of Paragraph 10*

House's second theory of breach turns on Paragraph 10 of the licensing agreement, which requires the licensee "to treat the Licensed Software as confidential information and exercise reasonable care to avoid unauthorized distribution of the Licensed Software."  Discovery in this case, they argue, yielded evidence that all three Defendants breached this provision.

The evidence regarding Burns Group is the most straight-forward.  During discovery, the

company produced an email indicating that one of its employees had uploaded the Neutraface font software to a Dropbox site.  Nicole Lucey, the company's creative director, testified at her deposition that the software's confidentiality was nonetheless maintained, as "only Burns Group employees can access [it]."  But House argues that this was not the case, and that as late as the end of discovery, its attorneys were able to access the Dropbox site and freely download the files it contained.  In support of this contention, it points to screenshots of the Dropbox site showing the file available for download, as well as a sworn declaration attesting to those screenshots' veracity and stating that the font software could be downloaded without a password.

House's contention that Sway and PureRED's breached Paragraph 10 is somewhat narrower.  Email records produced by Rite Aid show that both Defendants transmitted what appears to be a copy of the Neutraface font software to a company called Elixir Solutions, a pharmacy benefits manager owned by Rite Aid.  In Sway's case, the transmission was direct: an email to an Elixir employee stating "Here is the typeface for the Rite Aid type treatment.  Hope this helps!" with a file labeled "NeutraType-Demi.otf" attached.  In PureRED's case, there is indirect evidence that a copy of the software was transmitted to Elixir: an email to a Rite Aid employee containing the "attached font to send to Elixir."  Either way, House argues, the emails unequivocally demonstrate that Sway and PureRED breached their confidentiality obligations, as while Elixir is a subsidiary of Rite Aid, the pharmacy chain's corporate representative testified that it is an "unrelated affiliate."

Defendants respond with a variety of counter-arguments, primarily that House's evidence is insufficient to establish breach, and that in any event House failed to properly plead a breach of Paragraph 10 in its Amended Complaint.  They might be right—particularly regarding that

second point.[6]  But the Court need not definitively settle either contention.  Even if House had properly pled this claim, and even if its evidence left no doubt that Defendants breached Paragraph 10 of the licensing agreement, the absence of any evidence of damages resulting from this breach is fatal to this theory of liability.

As noted, proof of damages is an element of any claim for breach of contract.  *Hart*, 884 A.2d at 332.  Barring unusual circumstances, the preferred measure of these damages is the plaintiff's "expectation" interest.  In other words, damages are awarded "to place the aggrieved in as good a position as would have occurred had the contract been performed."  *ATACS Corp. v. Trans World Comm'ns, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998); *see Restatement (Second) of Contract* § 347, cmt. a (Am. L. Inst. 1981) ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain.").  As with the existence of a contract and breach, "damages are an essential element of a breach of contract action."  *Rade v. Transition Software Corp.*, 1998 WL 767455, at *2 (E.D. Pa. Oct. 30, 1995).  And so when a plaintiff fails to adduce evidence that they were actually harmed by a defendant's breach of contract, their claim necessarily fails.

As will be discussed in Part III.C, *infra*, House's damages evidence in this case consists primarily of a report prepared by its expert, Graham D. Rogers.  In his report, Rogers calculated

---

[6] House argues that it satisfied Rule 8's pleading requirement by alleging that Defendants "engage[d] in unauthorized uses of Neutraface."  But the Federal Rules require that "the complaint . . . give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 676 F.3d 318, 326 (3d Cir. 2012) (quoting *Thomas v. Independence Twp.*, 463 F.3d 285, 295 (3d Cir. 2006)).  And this reference to "unauthorized uses of Neutraface" is just a legal conclusion.  The substance of the Amended Complaint was therefore the facts pled by House that illustrated *how* Neutraface was misused and demonstrated why, if true, it would be entitled to relief.  Those well-pled facts are what provided the required "fair notice of what the plaintiff's claim is."  *Liberty Lincoln-Mercury*, 676 F.3d at 326; *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (a complaint requires "[f]actual allegations," not mere "labels and conclusions").  And they related only to Defendants' use of Neutraface in the Rite Aid logo—not to any potential breaches of Defendants' confidentiality obligations.

"the value of the hypothetical license that defendants were obligated to, but did not, obtain," which he placed at approximately $7.5 million. *Brand Design Co. v. Rite Aid Corp.*, 2024 WL 643141, at *1 (E.D. Pa. Feb. 14, 2024). But, it is clear from the Court's review of this report that Rogers' analysis merely addressed the damages resulting from Defendants' use of Neutraface in Rite Aid's new logo and related promotional materials—*i.e.*, their alleged breaches of Paragraphs 8(k) and 2—and not their breaches of Paragraph 10. The report does not even acknowledge House's contention that Defendants breached Paragraph 10's confidentiality requirement, let alone provide the necessary explanation for how the damages it calculated were causally linked to any such breach. *See Logan v. Mirror Printing Co.*, 600 A.2d 225, 226 (Pa. Super. 1991) ("In order to recover for damages pursuant to a breach of contract, the plaintiff must show a causal connection between the breach and the loss.").

Beyond Rogers' report, House points to no other evidence of damages resulting from Defendants' alleged breach of Paragraph 10, nor was any evident in the Court's review of the summary judgment record. To the extent House believes it was harmed by the loss of confidentiality *qua* confidentiality, nothing in the record would permit a jury to determine damages resulting from this nebulous harm to any degree of reasonable certainty. *See Bostick v. ITT Hartford Grp., Inc.*, 82 F.Supp.2d 376, 381 (E.D. Pa. 2000) ("Unless plaintiffs produce such evidence, the issue will not be submitted to a jury.").

At oral argument, House suggested that even if there was no evidence of expectation damages, it would still have a claim for nominal damages for Defendants' breaches of Paragraph 10. This is true insofar as it goes: it is black letter law in Pennsylvania that "[i]f a plaintiff is able to prove a breach of contract but can show no damages flowing from the breach, the plaintiff is entitled to recover nominal damages." *Thorsen v. Iron & Glass Bank*, 476 A.2d 928, 931 (Pa.

Super. 1984).  Thus, summary judgment "on the sole basis of absence of provable damages [] is generally improper."  *Id.*  But, in order to "defeat summary judgment based on an entitlement to nominal damages, a plaintiff must request nominal damages in its complaint or seek to amend its complaint to request nominal damages."  *Welding Eng'rs Ltd. V. NFM/Welding Eng'rs, Inc.*, 352 F.Supp.3d 416, 435 (E.D. Pa. 2018); *accord Cohen v. Resolution Tr.*, 107 F. App'x 287, 289 (3d Cir. 2004) ("Pennsylvania courts have only reversed a trial court's failure to award nominal damages if the plaintiff has, at a minimum, requested nominal damages or sought permission to amend the complaint to do so.") (citing cases).

Here, the *ad damnum* clause in House's Amended Complaint sought a range of remedies—including "actual damages, enhanced damages, exemplary damages, costs, prejudgment and post judgment interest, and reasonable attorneys' fees"—but it did not request nominal damages.  Accordingly, because no evidence ties Defendants' alleged breaches of Paragraph 10 to damages sustained by House, this theory of breach of contract must fail.

### iii.    Other Breaches

House's final theory of liability, which it presses against Burns Group and PureRED only, stems from these Defendants' use of Neutraface in applications other than Rite Aid's logo. As to Burns Group, House argues that it used Neutraface "in connection with letterhead and monographs for Rite Aid, prescription bottle caps, prescription bags, name badges, and the Rite Aid brand guidelines."  Similarly, it argues that PureRED used Neutraface in connection with "digital, social media, and web advertising, print and point-of-sale advertising, signage, immunization record cards, gift cards, corporate communications material for Rite Aid, and promotional marketing materials."  Because there is no material dispute as to this evidence, House argues, it is entitled to judgment as a matter of law that Defendants violated their

licensing agreements.

Textually, this theory of breach gets off to a rocky start because unlike the use of Neutraface in a logo, Defendants' contracts do not explicitly prohibit using the font in these applications.  The absence of this provision is particularly noteworthy, as such a restriction was included in the version of the licensing agreement attached to the Amended Complaint.  Specifically, Paragraph 8(d) of that contract directs that Neutraface not be used in "[a]ny product for sale, product packaging, digital/social media/web advertising, print/POS advertising, and/or tv advertising."  If present here, this restriction would plainly cover Defendants' actions.  But this language was not included in the versions of licensing agreement that Burns Group and PureRED actually agreed to.[7]  Paragraph 8(d) of these Defendants' contracts merely bar the use of Neutraface in "[a]ny product for sale where the shape of the product is determined by the shape of single or multiple glyphs from the font data," something neither Defendant stands accused of doing.

Notwithstanding this absence of this provision, House maintains that such a prohibition may be inferred from other sections of the licensing agreements.  It first points to Paragraph 2, which identifies the "[l]icensed uses of the Licensed Software and Fonts and glyphs generated thereby" as including "installation on the number Devices specified on the invoice," "[e]mbedding in documents for the purposes of" small scale distribution and print production, and "[u]se in conventional office correspondence."  This provision, House argues, enumerates the only permitted uses for Neutraface, and these permitted uses did not include utilizing the font in connection with signage, branded products, and the like.  House further points to Paragraph

---

[7] It was present in version agreed to by Sway, but House does not contend that this Defendant utilized Neutraface in any application other than Rite Aid's logo.

14, which states that "[a]ll rights not expressly identified and granted as a part of this License are expressly reserved by House Industries."  As explained, most (if not all) of Defendants' uses of Neutraface were in applications other than those expressly authorized by Paragraph 2.  Taken together, House argues, these provisions make clear that Defendants not only violated their licensing agreements when utilizing Neutraface in Rite Aid's logo, but also when they utilized the font software in these other applications.

But it is axiomatic that the purpose of contract interpretation "is to ascertain and give effect to the intent of the contracting parties," and this intent is best determined by the plain text of the written agreement.  *Hart*, 884 A.2d at 332 (quoting *Murphy v. Duquesne Univ.*, 777 A.2d 418, 429 (2001)).  Thus, "a court may not rewrite into contract conditions that parties did not insert or, under the guise of construction, remake a contract to implement an unexpressed intention."  *O'Sullivan v. Joy Tech., Inc.*, 666 A.2d 664, 668 (Pa. Super. 1995) (quoting *In re 17th Glenville Corp.*, 625 N.Y.S.2d 100, 101 (N.Y. App. Div. 1995)); *accord Hutchinson v. Sunbeam Coal Corp.*, 519 A.2d 385, 388 (Pa. 1986) ("The law will not imply a contract different than that which the parties have expressly adopted.").  Here, House's interpretation of the licensing agreement violates this fundamental tenant.

First, House is mistaken that the licensing agreement limits the permitted uses of Neutraface to only those uses specifically enumerated in Paragraph 2.  While that provision identifies three examples of "[l]icensed uses of the Licensed Software and Fonts," this list was introduced by the word "include."  The ordinary meaning of the word "include," at least when it precedes a specific list of included items, is that it should "be considered as [a] word[] of enlargement and not limitation."  *Dept. of Env. Prot. v. Cumberland Coal Res., LP*, 102 A.3d 962, 976 (Pa. 2014); *accord Tax Matrix Tech., LLC v. Wegmans Food Markets, Inc.*, 154

F.Supp.3d 157, 175 (E.D. Pa. 2016) ("[T]he list included after the words 'shall include' may be read as illustrative rather than exhaustive or definitive.").  The contract offers no reason to think that the parties intended to depart from this common usage.  Thus, while the text of Paragraph 2 identifies three permitted uses of Neutraface, such as its "[u]se in conventional office correspondence," it does not follow, as House argues, that all other uses are necessarily prohibited.

This conclusion is buttressed by the fact that the licensing agreements plainly envisions, and accordingly prohibits, other uses of Neutraface beyond those listed in Paragraph 2.  Recall that Paragraph 8 of the contract consists of a lengthy list of "uses of the Licensed Software and Fonts and glyphs generated thereby [that] are expressly NOT PERMITTED under this agreement," such as "[i]n a logo," "eBook or ePublishing embedding," and "[u]se in entertainment services."  This provision would be entirely redundant if House's interpretation of Paragraph 2 were correct, since anything beyond the three three uses of Neutraface it expressly permits would already be prohibited.  This is not how parties typically understand their written instruments, and Pennsylvania courts have accordingly cautioned against "interpret[ing] one provision of a contract in a manner which results in another portion being annulled."  *Lesko v. Frankford Hosp.-Bucks Cnty.*, 15 A.3d 337, 342 (Pa. 2011) (quoting *LJL Trans., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647-48 (2009)).  In other words, contractual language must not "be treated as surplusage if any reasonable meaning consistent with the other parts can be given to it."  *Gen. Mills, Inc. v. Snavely*, 199 A.2d 540, 544 (Pa. Super. 1964).  House's proposed interpretation of the licensing agreements would do exactly that.

Regarding Paragraph 8, this provision, too, provides reason to conclude that Defendants' uses of Neutraface in applications other than a logo were permitted.  As explained, multiple

19

versions of House's licensing agreement exist, some of which expressly ban the uses of

Neutraface "in "[a]ny product for sale, product packaging, digital/social media/web advertising,

print/POS advertising, and/or tv advertising," and some of which do not.  The absence of this

prohibition in Burns Group and PureRED's versions is thus significant, as Pennsylvania courts

have determined that "*expressio unius est exclusio alterius* is a common and accepted method of

contract interpretation."  *Marion Ctr. Area Sch. Dist. v. Marion Ctr. Area Educ. Ass'n*, 982 A.2d

1041, 1046 (Pa. Commw. 2009); *see, e.g.*, *Clarke v. MMG Ins. Co.*, 100 A.3d 271, 276 (Pa.

Super. 2014); *Com., Dept. of Transp. v. Mosites Const. Co.*, 494 A.2d 41, 43-44 (Pa. Commw.

1985).  That maxim instructs "that the expression of one thing implies the exclusion of another

thing not mentioned."  *Marion Ctr.*, 982 A.2d at 1044 n.2.  And it supports an inference that

where parties could have, but did not, prohibit a specific use of Neutraface, that use is permitted.

Finally, to the extent that the preceding considerations leave any uncertainty as to the

licensing agreement's meaning, it is well-settled that "a contract is to be construed against its

drafter," which in this case was House.  *Vinikoor v. Pedal Pa., Inc.*, 974 A.2d 1233, 1238 (Pa.

Cmmw. 2009).  This principal points towards an interpretation of the licensing agreement that

lessens, rather than heightens, the licensee's potential liability.  *See Restatement (Second) of

Contracts* § 206, cmt. a ("Where one party chooses the terms of a contract, he is likely to provide

more carefully for the protection of his own interests than for those of the other party. . . . In

cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for

preferring the meaning of the other party.").  As Defendants argue, such an interpretation is

inconsistent with House's position that Paragraph 2 implies a restriction its text does not clearly

contain.

Taken together, these principles of contract interpretation make the meaning of the

Defendants' licensing agreements clear.  While some versions of that contract prohibited the use of Neutraface in product packaging, advertising, and similar, the versions which bind Burns Group and PureRED do not.  Thus, even assuming House's evidence showed that Burns Group and PureRED used Neutraface for these purposes, these uses did not violate the licensing agreement, and accordingly do not present a genuine dispute of fact that must be submitted to the jury.

### C.  Element 3: Damages

The final element of a breach of contract claim is damages, which as explained above, are typically based on the injured party's expectation interest.  House has adduced evidence as to the measure of these damages—namely, the report prepared by its expert witness, Graham Rogers.  As explained, Rogers calculated actual damages by determining the value of the theoretical extended use license House contends Defendants were obligated to, but did not, obtain.  Rogers put the value of this theoretical license at approximately $7.5 million, which House argues provides a sufficient basis "upon which the jury can determine the amount of damages without conjecture."  *McDermott v. Party City Corp.*, 11 F.Supp.2d 612, 628 (E.D. Pa. 1998) (citing *Delahanty v. First Pa. Bank, N.A.*, 464 A.2d 1243, 1257 (Pa. Super. 1983)).

While Defendants offer a variety of reasons why House's damages evidence is insufficient to create a triable issue of fact, their arguments largely stem from two premises that have now been rejected.  First, Defendants argue that House has adduced no evidence of their economic loss.  This would be true if the Court had granted Defendants' *Daubert* motions and excluded Rogers' expert opinions, but as previously noted, this did not happen.  *See Brand Design*, 2024 WL 643141, at *1.  Second, and relatedly, Sway's argument that "there can be no damages from something that Sway was not required to purchase" only follows if Defendants'

interpretation of the licensing agreement were correct.  Again, there is a genuine dispute of material fact on this very point, since the licensing agreement is ambiguous as to whether Defendants were, in fact, "required to purchase" an extended license to use Neutraface in a logo. Accordingly, House has demonstrated the proper measure of its expectation damages creates a genuine dispute of material fact that must be submitted to the jury.

In the alternative to expectation damages, House also argues that it is entitled to the disgorgement of PureRED's profit.  For background, the Third Restatement of Restitution instructs that "[i]f a deliberate breach of contract results in profit to the defaulting promisor and the available damage remedy affords inadequate protection to the promisee's contractual entitlement, the promisee has a claim to restitution of the profit realized by the promisor as a result of the breach." *Restatement (Third) of Restitution & Unjust Enrichment* § 39(1) (Am. L. Inst. 2011).  House argues that this is the case here, and that it is entitled to judgment as a matter of law that PureRED's breach of the licensing agreement was "deliberate."  PureRED counters that: (1) Pennsylvania courts have not adopted this Restatement provision, nor would they if given the opportunity to do so; (2) the available remedies are a matter of Georgia law,[8] and that jurisdiction would likewise reject this Restatement provision; and, (3) in any event, the evidence does not show that PureRED's breach was deliberate.

But as discussed above, House is not entitled to judgment as a matter of law that PureRED actually breached the licensing agreement.  at most, it has adduced evidence showing that there are material disputes of fact that must be submitted to the jury.  As a result, its

---

[8] In a single footnote in its opposition to House's motion for summary judgment, PureRED argues that the same is true of Delaware law.  But although PureRED's own motion for summary judgment notes that Delaware law is potentially relevant, as House is both incorporated and headquartered there, this footnote is the only point where it expressly seeks application of that forum's law.  The Court declines to do so: "An argument made only in a footnote is not worthy of credence (other than to be rejected by footnote)."  *Schmalz v. Sovereign Bancorp, Inc.*, 868 F.Supp.2d 438, 457 n.14 (E.D. Pa. 2012).

contingent argument that PureRED's breaches were deliberate is for the jury to consider in that it cannot be resolved here.

The same is true of Defendants' choice-of-law argument.  House has adduced sufficient evidence to create a triable dispute regarding expectation damages, which is enough to defeat Defendants' motion for summary judgment.

*    *    *

In sum, with respect to House's breach of contract claim, the summary judgment record establishes the existence of a contract between House and each of the three Defendants, and it shows a genuine dispute of material fact as to: (1) whether the Defendants breached Paragraph 8(k) of that contract when they used Neutraface in a logo; and, (2) the measure of damages resulting from that breach.  However, since House has neither alleged nor produced any evidence supporting damages arising from a breach of Paragraph 10 of the contract, its claim under that provision cannot proceed.  And the Defendants' remaining uses of Neutraface did not violate the licensing agreement.

## IV.   UNJUST ENRICHMENT CLAIMS

The second count in House's Amended Complaint is for unjust enrichment, which it presses against Sway and PureRED.  "Unjust enrichment is a quasi-contractual theory that allowed courts to disgorge a gain obtained improperly or unjustly by a defendant."  *In re Flonase Antitrust Litig.*, 692 F.Supp.2d 524, 541 (E.D. Pa. 2010).  In Pennsylvania, "[a] party alleging that a defendant has been unjustly enriched must establish the following: (1) plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) acceptance and retention by the defendant of the benefits, under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit."  *Com. ex rel.*

23

*Pappert v. TAP Pharma. Prods., Inc.*, 885 A.2d 1127, 1137 (Pa. Commw. 2005). "The polestar of the unjust enrichment inquiry is whether the defendant has been *unjustly* enriched; the intent of the parties is irrelevant." *Limbach v. City of Phila.*, 905 A.2d 567, 557 (Pa. Commw. 2006) (emphasis in original).

With regards to Sway, House's briefing concedes that discovery yielded no evidence to supports its claim for unjust enrichment. Accordingly, Sway's motion for summary judgment as to this claim will be granted, and the claim will be dismissed with prejudice.

Things are less straightforward as to its claim against PureRED, however. As discussed in Part III.B.i, *supra*, there is a genuine dispute of material fact as to whether PureRED's actions breached Paragraph 8 of the licensing agreement. In the event that the jury concludes that they did not, House maintains that its unjust enrichment claim can thus be submitted to the jury in the alternative. *See Kraus Indus., Inc. v. Moore*, 2007 WL 2744194, at *8 (W.D. Pa. Sept. 18, 2007) ("[A] claim for unjust enrichment will not be barred if it concerns conduct outside the scope of the original agreement or contract.").

But while claims of unjust enrichment and breach of contract may be pled in the alternative, "a plaintiff may not recover under a theory of unjust enrichment if the parties' relationship is governed by a written contract." *Brezinski v. Widener Univ.*, 582 F.Supp.3d 257, 267 (E.D. Pa. 2022). This rule is far from absolute; as the Restatement notes, "[r]estitution claims of great practical significance arise in a contractual context." *Restatement (Third) of Restitution & Unjust Enrichment* § 2 cmt. c (Am. L. Inst. 2011). However, such claims are the exception, not the rule, and they typically occur "at the margins, when a valuable performance has been rendered under a contract that is invalid, or subject to avoidance, or otherwise ineffective to regulate the parties' obligations." *Id.* None of these unusual circumstances is

present here, and House points to no other reason to depart from the ordinary rule. Indeed, though it insists that these two claims can invariably be *tried* in the alternative, both (non-precedential) cases it cites in support of this proposition—*Kraus Industries*, and *I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko"*, 500 F.Supp.3d 380 (E.D. Pa. 2020)—were decided at the motion to dismiss stage, and thus involved claims merely *pled* in the alternative. Accordingly, its claim for unjust enrichment against PureRED fails.

## V.    MOTIONS TO SEAL

In conjunction with their motions for summary judgment, House and PureRED have also moved to seal portions of the parties' briefing and the summary judgment record. In both civil and criminal contexts, "the common law presumes that the public has a right of access to judicial materials." *In re Avandia Mktg., Sales, Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019). Once this presumption attaches, it may only be rebutted by a showing that the parties' "interest in secrecy outweighs the presumption." *Id.* Specifically, "[t]he movant must show "that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *Id.*

For its part, House's various motions seek leave to seal documents containing two types of information: (1) proprietary financial data, and (2) confidential settlement communications. That first category is straightforward. As the Court previously explained, "[i]t is well established in this circuit that the disclosure of sensitive financial information is the sort of 'clearly defined and serious injury' warranting a departure from the presumption of access to judicial records." *Brand Design*, 2024 WL 643141, at *6 (E.D. Pa. Feb. 14, 2024) (citing cases). Here, the data House seeks to seal consists of proprietary pricing information, contracts executed with non-parties, and details regarding House's historic revenues. As before, "public disclosure of this

information would cause House to suffer a competitive disadvantage in the marketplace by undermining its negotiating position in future licensing ventures." *Id.* And the Court agrees that House's proposed redactions are appropriately tailored. *See id.* ("[P]arties should propose the most limited redactions consistent with preventing the injuries they identify.").

Regarding the parties' settlement communications, it is a "time honored principle that settlement discussions generally remain confidential." *EEOC v. U.S. Steel Corp.*, 877 F.Supp.2d 278, 292 n.27 (W.D. Pa. 2012). This principle, reflected in Fed. R. Evid. 408, derives from the strong federal policy of encouraging settlements. *See D.R. ex rel. M.R. v. E. Brunswick Bd. of Educ.*, 109 F.3d 896, 901 (3d Cir. 1997) ("Settlement agreements are encouraged as a matter of public policy because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by courts."). Here, as House argues, disclosing the contents of the parties' prior settlement discussions makes it less likely that these discussions will continue, undermining House's interest in reaching a negotiated settlement to this matter. The Court agrees, and further agrees that House's proposed redactions are appropriate.

PureRED, meanwhile, proposes numerous redactions to the summary judgment briefing and record, which it justifies with three reasons. First, it argues documents associated with a prior version of its summary judgment motion, which the Court denied as moot upon the filing of revised briefing, should be sealed in their entirety. Second, PureRED seeks to redact references to its proprietary financial data. Finally, it seeks to redact all information designated as confidential by Rite Aid, pursuant to the protective order entered in this case. PureRED's motion includes a table of proposed redactions. This table makes clear which of the redactions is associated with its first reason for sealing—the documents associated with its mooted briefing are identified by ECF number. But, for the rest of the proposed redactions, it is unclear which

justification applies.

To start with the prior version of PureRED's summary judgment motion, maintaining documents related to this mooted motion under seal is appropriate.  The public right of access applies only to "judicial records," which consist of documents "incorporated or integrated into a district court's adjudicatory proceedings."  *Avandia*, 924 F.3d at 672 (quoting *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001).  A prior version of the parties' motion that will never be evaluated on the merits falls outside this definition, and so the public right of access is not implicated.  Accordingly, the motion to seal will be granted as to these documents, which are identified in the order accompanying this opinion.

The remaining two categories of redactions are a different matter.  As a starting point, *see supra*, it is well established that the disclosure of proprietary financial information can cause "a clearly defined and serious injury."  *Avandia*, 924 F.3d at 672.  Accordingly, protection of such documents serves as a valid justification for sealing judicial records.  But, when a motion to seal implicates the public right of access, "specificity is essential."  *Id.* at 673.  And, when there is a request to circumvent the "strong presumption of openness" of judicial records, a court is required to conduct a document-by-document review engaging in careful fact-finding to determine whether each document sought to be sealed ought to be sealed.  *Id.* at 672-73.  Here, PureRED has not provided the Court with the tools to conduct that analysis.  Its motion does not differentiate clearly which of its proposed redactions are to protect its own sensitive financial information, and which are merely the result of Rite Aid's designation of confidentiality during the discovery process.  As the Third Circuit explained in *Avandia*, the common law right of access is "[a]nalytically distinct" from the Court's ability to protect discovery material under Rule 26(c).  *Id.*  And so, the mere fact that information was designated as confidential by a party

pursuant to a protective order is not a sufficient basis to seal it once it becomes a part of a judicial record.[9]  Absent the distinction being made by PureRed between its documents and Rite Aid's documents, the Court cannot make the required "specific findings on the record concerning the effects of disclosure." *Id.* at 672.  As such, that portion of PureRED's motion that concerns documents containing its financial  information as well as documents stamped confidential by Rite Aid during discovery, must be denied.

## VI.     CONCLUSION

For the foregoing reasons, House's motions for summary judgment will be denied, Defendants' motions for summary judgment will be granted in part and denied in part, House's motions to seal will be granted, and PureRED's motion to seal will be granted in part and denied in part.

An appropriate order follows.

**BY THE COURT:**

**/S/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**

---

[9] Moreover, *Avandia* requires that a party seeking to seal judicial records show "that disclosure will work a clearly defined and serious injury **to the party seeking closure**." *Id.* (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994)) (emphasis added).  PureRED makes no attempt to demonstrate that it will be harmed by disclosing materials designated as confidential by Rite Aid.